**Barbara ARNOLD and Terra Turner, Plaintiffs,**

v.

**Fernando J. MONTILLA and Pavia Hospital, Defendants.**

**No. CIV. 96–1014CCC.**

United States District Court, D. Puerto Rico.

July 14, 1998.

Edward E. Parson, Washington, DC, for Plaintiffs.

Ramonita Dieppa–Gonzales, Angel R. De-Corral–Julia, San Juan, PR, for Defendants.

## OPINION AND ORDER

CEREZO, Chief Judge.

This is a medical malpractice action arising under Puerto Rico law against Hospital Pavía and Dr. Fernando J. Montilla. The core of plaintiffs' medical malpractice action is the existence of an intestinal blockage which developed after her surgery. The allegations of negligence against the doctor are set forth in paragraph fifty (50) of the complaint where it is asserted that Dr. Montilla "caused an injury during surgery to Ms. Arnold's intestinal tract, thereby, causing an intestinal blockage," failed to diagnose and to treat said condition and to give adequate follow up treatment. The allegations of negligence against the hospital are set forth at paragraph fifty four (54), asserting that it failed to properly supervise the medical staff and Dr. Montilla, to evaluate and monitor plaintiff's condition in order to recognize the symptoms of intestinal blockage, thereby prematurely discharging her, despite her post-operative condition.

In August of 1994, Ms. Barbara Arnold, a St. Thomas, Virgin Islands resident, made an appointment with Dr. Montilla, defendant, for a gynecological examination in Puerto Rico. Dr. Montilla performed the examination on September 1, 1994 at his office. As a result of the examination, he informed Ms. Arnold that she needed a hysterectomy. After the surgery was performed on September 27, 1994, Ms. Arnold allegedly began experiencing continuous discomfort, nausea and vomiting. She claims that neither Dr. Montilla nor the primary care nurses recognized these symptoms as consistent with an intestinal obstruction.

Dr. Montilla discharged Ms. Arnold on October 1, 1994. She remained in Puerto Rico until she left for St. Thomas on or about October 4, 1994. While in Puerto Rico, she claims to have spoken with Dr. Montilla to describe her symptoms and that he instructed her to take Tums and Tylenol. She contends that she called Dr. Montilla again from St. Thomas, and that he told her that, if she was still in pain, she should see an internist. Following his advice, she went to the emer-

gency room of the St. Thomas Hospital, where she was seen by the surgeon on call, Dr. Lawrence Rawlings, who diagnosed an intestinal obstruction. She was operated on October 5, 1994. Dr. Montilla denies having had any post-operative conversations with Ms. Arnold, having prescribed Tums and Tylenol, or telling her to go to an internist in St. Thomas.

Before the Court is a motion for summary judgment **(docket entry 55)** filed by Dr. Montilla supported by a memorandum of law **(docket entry 54)** and defendant Hospital Pavia's motion joining it **(docket entry 56)**, Pavia's Motion for Summary Judgment on Further Grounds **(docket entry 57)**, and plaintiffs' opposition **(docket entry 59)** and plaintiff's second motion for partial summary judgment, one as to each defendant **(docket entries 63 and 65)**.

■■■ Under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141, a person who causes damage to another through fault or negligence shall be liable in damages. Causes of action sounding in tort are subject to a limitations period. Article 1868 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5295 establishes a one-year limitations period for actions arising from fault or negligence, from the time the aggrieved person had knowledge thereof. "A plaintiff who is not aware of the existence of a cause of action is essentially incapable of bringing suit within the limitation period." *Colón Prieto v. Géigel*, 115 D.P.R. 232, 237 (1984). "In circumstances where a plaintiff has not abandoned a cause of action, but instead was never aware that such a cause of action existed, the statute of limitations would not operate as a bar to the exercise of the plaintiff's legal rights." *Rodríguez–Suris v. Montesinos*, 123 F.3d 10, 15 (1st Cir.1997).

■■■ The Supreme Court of Puerto Rico has held that "a plaintiff will be deemed to have 'knowledge' of the injury, for purposes of the statute of limitations, when she has 'notice of the injury, plus notice of the person who caused it.'" *Id.* at 13; *Colón Prieto*, 1984 WL 270950, 115 D.P.R. at 247; *Santiago Hodge v. Parke Davis & Co.*, 909 F.2d 628, 632 (1st Cir.1990). Thus the "term does not start to run from the occurrence of the negligent act or damage, but from the moment the damage is known." *Barretto Peat, Inc. v. Luis Ayala Sucrs., Inc.*, 896 F.2d 656, 658 (1st Cir.1990) (quoting *Rivera Encarnación v. Estado Libre Asociado De Puerto Rico*, 113 D.P.R. 383, 385 (1982)).

■■■ Notice of the injury is established by proof of "some outward or physical signs through which the aggrieved party may become aware and realize that he/she has suffered an injurious aftereffect, which when known becomes a damage even if at the time its full scope and extent cannot be weighed. These circumstances need not be known in order to argue that the damage has become known, because its scope, extent and weight may be established later on during the prosecution of the remedial action." *Delgado Rodríguez v. Nazario De Ferrer Y Otros*, 1988 WL 580813, 121 P.R. Dec. 347 (Official English Translation) (P.R. May 16, 1988) (quoting H. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico* 639–40, Pub. J.T.S., Inc. (2d ed.1986)) (internal quotation marks omitted). "Once a plaintiff is on 'notice of the injury,' the plaintiff may 'not wait for his [or her] injury to reach its final degree of development and postpone the running of the period of limitation according to his [or her] subjective appraisal and judgment.' *Ortiz v. Municipio De Orocovis*, 1982 WL 210544, 113 P.R. Dec. 484, 487, 13 P.R. Offic. Trans. 619, 622 (1982)." *Rodríguez–Suris*, 123 F.3d at 13. However, existence of an injury alone will not always be enough to trigger the running of the statue of limitations. *See, e.g., Galarza v. Zagury*, 739 F.2d 20, 24 (1st Cir.1984) (stating that "knowledge of the author of the harm means more than an awareness of some ill effects resulting from an operation by a particular doctor"). "If a plaintiff is not aware of some level of reasonable likelihood of legal liability on the part of the person or entity that caused the injury, the statute of limitation will be tolled." *Rodriguez–Suris*, 123 F.3d at 13–14.

■■■ In order to fully understand issues of knowledge and notice, we must recognize that there are two types of 'knowledge' which affect the analysis of a statute of limitations situation. True knowledge applies where a

plaintiff is actually aware of all the necessary facts and the existence of a likelihood of a legal cause of action. The second is 'deemed knowledge.' The concept of deemed knowledge applies where a "plaintiff's subjective awareness is measured against the level of awareness that the plaintiff, having been put on notice as to certain facts and having exercised reasonable care regarding a potential claim, *should* have acquired." *Id.* at 14. Plaintiff claims the exception to the applicability of the concepts of notice and deemed knowledge. The exception deals with circumstances in which "a plaintiff's failure to make a timely filing of a claim is *reasonably* based upon the assurances of the person who caused the injury." *Id.* "If a plaintiff's suspicions that she may have been the victim of a tort are assuaged by assurances made by the person who caused the injury, a plaintiff will not be held responsible for failing to pursue her claim more aggressively." *Id.* at 16. When a plaintiff places *reasonable reliance* upon representations that her symptoms are not the result of a negligent action, the person who took refuge in her trust will not be rewarded. *Id.*

 "The law of Puerto Rico treats a person as being aware of all that, having awareness constituting *notice*, that person would have been likely to come to know through the exercise of care," keeping in mind that "actual knowledge is not required where, by due diligence, such knowledge would likely have been acquired." *Id.* To determine the point at which a plaintiff should be held responsible for the required level of awareness, a court should look to "whether plaintiff knew or with the degree of diligence required by law would have known whom to sue." *Kaiser v. Armstrong World Indus.,* 872 F.2d 512, 516 (1st Cir.1989). "Once a plaintiff is made aware of facts sufficient to put her on notice that she has a potential tort claim, she must pursue that claim with reasonable diligence, or risk being held to have relinquished her right to pursue it later, after the limitation period has run. *See, e.g., Villarini–García,* 8 F.3d at 85." *Rodriguez–Suris,* 123 F.3d at 16.

 Plaintiff Arnold was aware of sufficient information which placed her on notice

that she could bring a malpractice action against both the surgeon who performed the hysterectomy and Pavía Hospital. It is undisputed that Ms. Arnold spent approximately four days at Pavía after Dr. Montilla performed the surgery, that upon her return to St. Thomas, she was admitted to St. Thomas Hospital on October 4, 1994 where Dr. Lawrence Rawlings operated on her for an intestinal blockage on October 5, 1994.

Plaintiff filed on March 2, 1998 (**docket entry 59**) a statement of uncontested material facts in support of her own Motion for Partial Summary Judgment. Uncontested fact number 8 she stated, referring to her deposition testimony, that "following the hysterectomy surgery, and less than twenty-four hours after surgery, she began to vomit green and black masses, on a regular basis, daily every four hours."

Uncontested facts 28, 29 and 30 proffered by her, all based on her own deposition, reflect that she was released from the hospital on October 1, 1994 with no bowel movement that Dr. Montilla insisted that the surgery was correctly performed and she would be all right, yet she had to call him, after being discharged because she was vomiting.

Excerpts of her deposition submitted by defendant Montilla reflect that the information that she received from Dr. Rawlings before and after her second surgery:

**Q. Okay? Did Dr. Rawlings inform you prior to the surgery, that this surgery was necessary because of the prior surgery performed by Dr. Montilla?**

**A. Yes.**

**Q. Did you speak with-strike that.**

**Did you have any doubt, Ms. Arnold, that the problems you were experiencing were a result, a direct result, of Dr. Montilla's surgery?**

**(Ms. Arnold's Tr. p. 76, lines 18–25.)**

**A I didn't have any doubt, but I wasn't really worried about that at that moment.**

Q Uh-huh.

A I wasn't like evaluating causes. I was concerned about stopping the misery.

Q Okay. But still and all, you were-you were having problems subsequent to the surgery performed by Dr. Montilla, and you told me you had lost confidence in Dr. Montilla's handling of the situation?

A Yes, I think he didn't listen to me, he didn't believe me.

Q Okay. Did you speak with Dr. Rawlings after the surgery, the surgery for-the surgery he performed on the 5th of October?

A yes, I saw him a lot after that.

Q Okay. Did he mention to you what his findings were?

A He—

Q What was wrong with you, and what he did and why he did it?

A Yes, he did, yes, he did.

Q Okay. What did he tell you?

A I don't remember the terms.

Q Okay, but in your own terms, your best recollection?

A but he told me that I had a blockage that was caused by a-some kind of a problem that happened with the surgery I just recently had. An that this is what he had to do, he just basically-he didn't tell me the details of the operation, but he said that he had cleared the blockage and I shouldn't have anymore problems.

(Ms. Arnolds' Tr., p. 77, lines 1 through p. 78, lines 1–4.)

Q. Did he tell you at that point in time, Ms. Arnold that Dr. Montilla had failed to do something, and that this is caused-that this had caused you a problem?

A He didn't say that Dr. Montilla had done something, he said the prior surgery that I had was the cause of-was the cause of the blockage. And he really didn't spend any time talking to me about Dr. Montilla.

Q Uh-huh.

A So I couldn't say that he said that Dr. Montilla did something to me, that kind of thing. I just-we all assume that something went wrong with the other surgery.

Q. Uh-huh.

And did you assume it at that time that you were talking with Dr. Rawlings? A

Well, like I'm telling you now. At that time I really couldn't care less about whether it was caused by Dr. Montilla or you know, anybody else.

(Ms. Arnold's Tr., p. 78, lines 9–25.)

Dr. Rawlings testified that he always closes the peritoneum or reperiotonealizes the abdominal area after concluding surgery because without the peritoneal surface it is less likely to have adhesion formation. (Tr. pp. 82–83.) He testified at his deposition as follows:

Q What is your relationship with Ms. Arnold other than patient and doctor?

A Well, the first time I saw Ms. Arnold was when I saw him her as a patient. I saw her in post-op in my office at one point and I haven't seen her since and I haven't had any relationship with her other than being a patient.

(Dr. Rawlings' Tr. p. 42, lines 19–25.)

Q Let me just check my notes and see if there is anything else. Oh, yes. Doctor, one last area that I wanted to cover with you if you would bear with me for a little while. Did you talk to Mrs. Arnold about your findings and recommendations after she had been submitted to surgery on October 5, 1994?

A I told her what the findings were, that she had intestinal obstruction. That's as far as we had gone with that. As a matter of fact, I haven't talked to Ms. Arnold since she was last seen in the post-op period. I have not talked or seen her since.

Q Could you please tell me what, to the best of your recollection, was it that you told Ms. Arnold about her condition?

A I just told her exactly the same thing I told you, that she had intestinal obstruction, secondary adhesions to the pelvis.

Q Did you talk about the etiology of the adhesions or what you though were the reasons for those adhesions?

A The only think I could tell you there was an area which it was stuck down to, the same as I have said here all along, the only thing I could tell her is that she had adhesions to the pelvis in the area where it

was not peritonealized. That's all I could tell her and I have said that over and over again. I can't comment one way or the other except giving you the facts as I found them. That's all I can tell you, what my findings are and what she had.

Q And that is what you informed your patient-

A Exactly.

Q -after the surgery had been performed?

A That's exactly what I told them. What I telling you here now, that's exactly what I told her, she had an obstruction and we relieved the obstruction and it was stuck down in the pelvic.

(Dr. Rawlings' Tr. p. 90, lines 13 through p. 91, line 24.)

Plaintiff Arnold, as plaintiffs Rodríguez and Villarini[1] in the cases cited above, failed to exercise due diligence in pursuing her claims despite the fact that she had known since October 1994, that her second surgery was necessitated by complications resulting from her first surgery by Dr. Montilla at Pavía Hospital. Whatever misguidance, resulting from his reassurances that the surgery was successful and that she was only suffering from an upset stomach, lasted only a few days. The deterioration of her condition to the point that she required a second operation, and her own understanding of the relationship between her prior surgery and the intestinal blockage, as evidenced in her deposition testimony, are clear indicators that she could not reasonably rely on representations made by the alleged tortfeasor. Immediately after undergoing the second surgery, she learned that the problems she had been experiencing-vomiting, pain and the need for further surgery were a result of the first operation by Montilla. The information she had received linking her injury to the first surgery also clearly pointed to Dr. Montilla and the hospital as responsible parties.

At this point, Arnold knew enough to require her to seek the advice of an attorney regarding her possible malpractice claims. On the basis of the evidence in the record before us, we conclude that a reasonable fact finder could come to only one finding on the limitations issue: in favor of the defendants. Ms. Arnold had sufficient facts that put her on notice that she had a potential tort claim. As such, her failure to make a timely filing of a claim was not reasonably based upon the assurances of Dr. Montilla, for a reasonable person would have pursued and investigated the likelihood of the existence of a cause of action so as to discern whether it was, in fact, present or not. The exception to the concepts of notice and deemed knowledge does not apply to this case. Plaintiff had deemed knowledge, if not actual knowledge, of the fact that she might have had a tort action, if properly and timely pursued. "Thus, plaintiff's failure to consult with a lawyer or otherwise investigate the claim to which she had been alerted by the factual circumstances associated with the operation barred her from commencing that claim in the courts over one year after being on notice." *Villarini–García,* 8 F.3d at 85.

For the reasons stated, the Motion for Summary Judgment filed by Dr. Fernando J. Montilla (**docket entry 55**) joined by Hospital Pavía (**docket entry 56**) and Pavía's Motion for Summary Judgment on Further Grounds (**docket entry 57**) are GRANTED.

SO ORDERED.

---

**1.** Except for the claim of removal of muscle without biopsy.